THE STATE OF FLORIDA, ex rel. R. HUDSON BURR, A. S. WELLS and A. D. CAMPBELL, as Railroad Commissioners of the State of Florida, *Relators*, v. ATLANTIC COAST LINE RAILROAD COMPANY, a Corporation, *Respondent*.

En Banc.

Opinion filed December 4, 1928.

*James E. Calkins,* of Miami; *Fred H. Davis,* of Tallahassee; *Theo T. Turnbull,* of Monticello, and *Maguire and Voorhis,* of Orlando, for Relators,

*W. E. Kay,* of Jacksonville, for Respondent.

STRUM, J.—This is an original proceeding by mandamus on relation of the railroad commissioners to compel compliance by the respondent, Atlantic Coast Line Railroad Company, with Order No. 783 of the railroad commissioners. The order required the respondent to enlarge its switching limits at Sanford so as to include what is known as Whither's Siding, and to apply to intrastate shipments to and from said siding the same rates and treatment accorded to like shipments to and from other points within the switching limits of Sanford.

Respondent resists enforcement of the order on the grounds that such enlargement of the switching limits is unnecessary and objectionable from an operating standpoint, that substantial dissimilarities exist between conditions affecting the service at Whitner's Siding and those affecting the service to points now embraced within the Sanford switching limits; and that to include Whitner's Siding within the Sanford switching limits would result in an unjust discrimination against other points along the branch line upon which Whitner's Siding is situated.

Respondent operates several main line tracks into and out of Sanford, along with the switching limits terminate at various distances from the Sanford freight station. To the north toward Jacksonville, the switching limits extend 3.850 miles from the station; to the south toward Orlando 1.065 miles; on the Tavares branch 2.023; on the Sanford and Everglades branch 1.750 miles; and on the Oviedo branch 1.750 miles, these limits being fixed by respondent.

The Oviedo branch, after leaving the main line south to

Orlando a short distance south of the freight station, itself proceeds in a general southerly direction. About three-quarters of a mile southeasterly from the Sanford freight station, at a point within the Sanford switching limits, the Sanford and Everglades branch leaves the Oviedo branch, the former proceeding easterly about three miles, thence southerly about three miles, thence southwesterly about 3½ miles to a point where it again connects with the Oviedo branch, thus forming a loop, roughly a square in shape, the northerly, easterly and southerly sides of which are formed by the Sanford and Everglades branch and the westerly side by the Oviedo branch. The northwesterly part of this loop lies within the city limits of Sanford. The remainder traverses territory to the southeastward of Sanford, serving a number of shipping points located at varying intervals along the loop. The Sanford and Everglades branch is regarded by the respondent as main line.

Whitner's Siding, here in controversy, is a small spur track having a capacity for five cars and is located on the northerly side of the Sanford and Everglades loop, near the northwest corner of the loop. It is well within the city limits of Sanford as constituted when this controversy commenced, and is now constituted, the city limits having been subsequently enlarged. It is approximately one-half mile easterly of the point where the Sanford and Everglades branch leaves the Oviedo branch, and is about one-third of a mile beyond the present switching limits on the Sanford and Everglades branch. Proceeding from Sanford, Whitner's Siding is the first shipping point reached on the Sanford and Everglades branch, the next station being abount one and one-half miles further east. Whitner's Siding is 11,040 feet southeasterly of the Sanford freight station.

On the Tavares branch at a point 10,740 feet westerly of the Sanford freight depot is located another spur track

called Smith's siding. The latter was not within the city limits of Sanford when this controversy was commenced. On the main line north toward Jacksonville at a point 10,200 feet northwesterly from the station is located another spur track called Dutton's siding. Further north along the main line toward Jacksonville, at a point 13,100 feet northwesterly from the station is Rand's yards where incoming freight trains from Sanford are broken up and outgoing trains are assembled. In actual operation, all switching movements on inbound freight originate at Rand's yards, and all switching movements on out bound freight terminate there. Cars in and out of Whitner's Siding are usually handled by switching engines from the Sanford yard operating as specials, the engines hauling out a string of cars from the Rand yards and leaving them at Whitner's Siding and other destinations along the Sanford and Everglades branch. Returning, the same engines pick up such cars as are ready to move and haul them to the assembly yards at Rand's. These movements are handled by the respondent as a main line movement because they move beyond the Sanford switching limits, but there is no regular scheduled operation of main line trains to Whitner, or around the Sanford and Everglades loop. There is no passenger traffic over the Sanford and Everglades loop. Only car load freight shipments are handled to Whitner's Siding.

The Sanford switching limits as now constituted by the respondent include Smith's siding and Dutton's siding, but exclude Whitner's Siding by about one-third of a mile, although the distance from the freight station to all these points is substantially the same. No substantial differences in operating conditions relative to the three sidings exist other than that now occasioned by the short main line movement to reach Whitner's Siding necessitated by the

exclusion of that siding from the present switching limits. The volume of business moving to and from Whitner's Siding is considerably greater than that to and from Smith's and Dutton's sidings. Dutton's siding is near the break up and assembly yards at Rand's than either Smith's siding or Whitner's siding, Dutton's siding being only about 900 feet distant from the Rand's yard, but Smith's siding and Whitner's siding measured by railroad, are substantially equi-distance from Rand's as well as from the freight station, Whitner's Siding being perhaps 300 feet further away.

Smith's siding and Dutton's siding being within the switching limits, are treated by the respondent as part of the Sanford terminal. The Sanford freight rate is applied to all shipments to and from these points. Whitner's Siding is treated by the respondent as an independent main line station, because it is one-third of a mile beyond the switching limits as now fixed by the respondent. A different rate, higher than the Sanford rate, is charged upon shipments to and from Whitner's Siding, the additional charge being made to cover the cost of the main line haul of about one-third of a mile. The billing of shipments from Whitner's Siding, however, is performed at the Sanford agency. There is no platform, station, or facilities other than the spur track at Whitner's.

Respondent vigorously protests that the extension of the Sanford switching limits to include Whitner's Siding is unnecessary and objectionable from an operating standpoint and therefore should not be made.

The following testimony, however, upon cross examination of respondent's general superintendent of the division in which Sanford is located, illustrates the absence of any specific objection from an operating standpoint, other than

the opinion of respondent's operating officers, that such enlargement is "unnecessary":

"Q. But I understand that you concede if the limits are extended to include Whitner, that it will not interfere in any way with the operation of trains in or out of Sanford, for the operation of switch engines, or the operation of your yards in general at Sanford?

"A. Only to the extent that we consider it unnecessary.

"Q. Yes, but you are stating no objections, you are just using the term "it is unnecessary" from an operating standpoint. In other words, it will not help you any from an operating standpoint?

"A. Yes, sir.

"Q. But it will not hurt you to extent, from an operating standpoint, it is purely a rate question?

"A. That would be determined later on. You have to watch your operating and see if there is any impediment.

"Q. You do not know of any right now, do you?

"A. Right now, I do not."

The railroad commissioners found in effect that there were no sufficient objections from an operating standpoint to including Whitner's Siding within the switching limits of the City of Sanford, which necessitates an extension of such switching limits about one-third of a mile along the Sanford and Everglades branch; and that the practice of the respondent in applying the Sanford rates and charges to car load shipments to and from Dutton's siding and Smith's siding and Smith's siding, while applying higher rates and charges on similar shipments to and from Whitner's Siding, occasioned by the curtailment by the respondent of the switching limits so as to exclude Whitner's

Siding by about one-third of a mile, is an unjust discrimination against shippers using Whitner's Siding.

Carrier's are not required to equalize disadvantages of location or other substantial inequalities between shippers to avoid a charge of discrimination, but so long as no unjust discrimination results they may establish reasonable territorial limits for the operation of their switching engines, and may give shippers within those limits the benefit of economies resulting from substantial dissimilarity in conditions of service. St. Louis Q. M. & S. Ry. Co. v. State, 165 So. W. R. 251. It is, however the duty of respondent as a common carrier to so conduct its public business as to avoid unjust discrimination, as to either rates or service, between shippers who are similarly situated.

So long as no unjust discrimination results, the respondent is at liberty to fix its switching limits where it will. The present main line movement, one-third of a mile, to reach Whitner's Siding could be eliminated by the respondent by moving out its yard limit board on the Sanford and Everglades branch so as to include Whitner's Siding. The respondent is under no restraint in so extending its switching limits, save that dictated by its own judgment in respect to operating conditions at that point. But the respondent contends that the extension of its switching limits, as stated, is unnecessary and therefore objectionable from an operating standpoint.

Within switching limits, switching movements may operate without main line orders. For the protection of switching movements thus operated, main line freight trains are required to slow down so as to be able to stop within vision. Passenger trains are required to proceed with caution. From an operating standpoint, therefore, it is desirable to fix the switching limits at points no further from station points than is necessary to meet

actual requirements for switching movements in the vicinity of stations, so as not to unnecessarily impede main line trains. The primary considerations of the railroad operator in fixing switching limits seem to be to fix the same so as to provide a switching area adequate to transportation needs, within which switching movements may operate without main line orders and within which main line trains must operate so as to protect switching movements, but to make these limits no larger than is essential, in order that interference with main line trains may be minimized.

From an operating standpoint, the major objection to enlarging switching limits seems to be the increased interference with main line movements. Since, however, there are no main line movements on the Sanford and Everglades branch in the sense of through schedule traffic, and since the only movements to Whitner's Siding are really switching movements operating under main line orders solely because Whitner's Siding is slightly beyond the switching limits as now fixed by the respondent, there appears no objection from an operating standpoint to the enlargement here in question sufficient to overcome the *prima facie* reasonableness of the order in question. That part of the Oviedo branch affected by movements to Whitner's Siding is already within the switching limits.

The only justification found in the testimony for applying a freight rate to and from Whitner's Siding higher than that applicable to Smith's and Dutton's sidings is the fact that a main line haul of about one-third mile is now necessary to reach Whitner's Siding, entailing the operation of trains under regular main line orders, manned by crews conforming to requirements for main line trains, thereby involving an additional expense over a purely switching movement. This objection, however,

as we have seen, may be eliminated by the respondent by merely moving the yard limit so as to include Whitner's Siding so that movements may operate to that point without main line orders. This the respondent is at liberty to do, but objects for the reason that it is unnecessary from an operating standpoint. As applied to the enlargement here in question, however, so as to include Whitner's Siding, this objection seems to us to be without sufficient foundation to overcome the *prima facie* reasonableness of the railroad commissioners' finding to the contrary.

It appears by the testimony before us that Whitner's Siding, with respect to use and to operating conditions and switching service at Sanford, is in substantially the same relative status as Dutton's siding and Smith's siding, both of which enjoy Sanford rates. Smith's siding, enjoying the Sanford rate, is not within the city limits of Sanford, as those limits existed when this controversy commenced, but Whitner's, to which the higher rate is applied, was well within the city limits of Sanford. The latter fact, however, is, of course, not conclusive. Did there exist substantial distances in operating or other conditions between Whitner's Siding and the Dutton and Smith sidings, a different situation might be presented, nothwithstanding the relative location with reference to the city limits. St. Louis Chamber of Com. v. B. & O. R. R., 57 I. C. C. 639; Western Meat Co. v. Director General, 78 I. C. C. 77; New Bedford Board of Commerce v. Director General, etc., 55 I. C. C. 320.

The respondent urges that if it is required to include Whitner's Siding within its switching limits and to apply Sanford rates to shipments to and from that point, it would inevitably follow, in order to avoid unjust discrimination against other shipping points along the Sanford and Everglades loop, that the same treatment must be accorded to

these other points, thereby indefinitely and illogically enlarging the Sanford switching limits and unjustifiably reducing respondent's revenue. But that result would not necessarily follow. That is a question which must be decided upon the facts pertaining to controlling, operating and other conditions affecting these latter stations as compared to other shipping points within the Sanford terminal. Substantial differences in operating or other conditions with respect to distance, relative location, and other material factors entering into the service and use, might justify a main line haul to reach other shipping points on the Sanford and Everglades branch, or an appropriate compensatory charge therefor, even though Whitner's be included within the Sanford switching limits. That question, however, is not now before us.

Upon the facts involved in this case, it appears to us that the railroad commissioners' finding of the existence of an unjust discrimination against shippers using Whitner's Siding, and the order requiring the enlargement of the Sanford switching limits so as to remove the causes of such discrimination is not unreasonable.

It is, therefore, ordered that the peremptory writ issue.

ELLIS, C. J., AND WHITFIELD, TERRELL, BROWN AND BUFORD, J. J., concur.